UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) |
| v. | ) <br> ) Docket No. 10 CR- 858-01 <br> ) |
| CLAIRE ABDELDAIM, | ) <br> ) |
| Defendant. | ) <br> ) <br> ) |

## DEFENDANT'S SENTENCING MEMORANDUM

This sentencing memorandum is submitted on behalf of Claire Abdeldaim in anticipation of sentencing, which is scheduled for June 20, 2011 at 11:00 am.

## I. INTRODUCTION

On March 9, 2011, Ms. Abdeldaim was convicted by a jury of making false statements to Customs officials at JFK airport upon her return from a trip to the African nation of Sudan. The jury concluded that Ms. Abdeldaim intentionally concealed her possession of $170,000 in United States currency and lied to Customs officials in an effort to deceive them.

## II. PERSONAL CHARACTERISTICS

### Family Background

Claire Abdeldaim will be sixty-five years of age on Saturday, June 25, 2011. She is a native of Haiti having immigrated to the United States in 1969. She became a United States citizen in 1979.

In 1993, Claire's husband, Hassan Abdeldaim, died of an acute asthma attack at the age of 41. Their children were 21, 19 and 12 years of age at the time. Today, her son Mahir is the Director of the Digital and Media Social Group at Mount Sinai Hospital in Manhattan. Her daughter, Fatima, is a guidance counselor in Texas and her youngest daughter, Amina, is a medical doctor who was just awarded a fellowship at Harvard Medical School. As is evident from the Probation Report, Claire enjoys extremely close ties, not just with her children, but with her extended family as well. Her children are aware of the case and remain supportive of their mother and concerned for her future. Her son, Mahir, and her daughter, Amina, were in attendance throughout the trial.

### Education and Employment

Claire's belief in the value of education was passed on to her children by virtue of the example she set in her own life. As detailed in the PSR at paragraphs 51 though 56, Claire has a Bachelors of Science Degree and two Masters Degrees.

Since 2005, Claire has been employed as a New York State licensed social worker at the Hebrew Hospital Home in the Bronx. Her day-to-day responsibilities include supervising eight staff members, coordinating services, providing in service training and hiring of new staff members. While she attempted to open a nursing home in Pennsylvania in 2005, for many reasons, the undertaking was unsuccessful. In short, she has spent most of her working years caring for others in her capacity as a social worker.

### III. OFFENSE CONDUCT

With minor exceptions, there is little difference between Ms. Abdeldaim's version of the offense and the version embraced by the government and its witnesses.

Ms. Abdeldaim's June 6th 2010 encounter with a Customs and Border Protection Agent at JFK was preceded by an exhausting and dangerous trip to the Sudan. The purpose of the trip was to sell a vacant parcel of land that belonged to her late husband, Hassan Abdeldaim, when he died in 1993.

Although Claire had worked hard to provide for her children, the financial resources available to the family where not what they would have been had Hassan been alive. As her children grew to adulthood, Hassan's interest in the Khartoum property became more important. At the time of his death at forty-one, the parcel

-3-

of land was the Abdeldaim's only asset other than their home. As the years passed, Claire began to explore the idea of selling the Khartoum property and a plan to travel to the Sudan began to take form. She was open with her children about her intentions and all three expressed their concern for her safety and their desire that she just "leave it be." As reflected in the PSR, all of Claire's children are deeply devoted to their mother. They recognized the danger of the undertaking and took every opportunity to convince her to change her mind. In the end, Claire felt that it was her obligation to secure her children's modest inheritance. She believed that if she did not act, it would be lost.

In order to complete the task, Claire was required to obtain Power of Attorney for her three children for the purpose of transacting the land sale in the Sudan on their behalf. The Power of Attorney forms described the land sale that was to take place and were reviewed by the Department of State and certified for use in Africa.

With the help of her companion, Sadig Rasheed, Claire hired a real estate "broker" and an attorney in the Sudan to handle the details of the sale. Mr. Rasheed is a native of the Sudan, a naturalized United States citizen and the retired Director of UNICEF. Sadig and Claire flew to the Sudan on three occasions before the final trip in late May of 2010.

-4-

Once in Africa, the sale of the property was concluded without incident and the proceeds of the sale, 500,000 Sudanese pounds, were received by Claire. As indicated in the PSR at ¶11, Claire attempted to convert the Sudanese currency to U.S. dollars and was told by "various Sudanese bank officials that it was not possible." Relatives of Sadig Rasheed offered to help with the conversion of the currency. The transaction was completed and the 500,000 Sudanese pounds were converted to $170,000 in United States currency. Claire prepared to go home.

In her limited experience with the Sudan, it was apparent to Claire that the country was a corrupt and lawless nation. When it was suggested that she conceal the cash when leaving Khartoum in order to avoid detection by corrupt border officials, the idea made her uncomfortable, but it also made sense.

Prior to arriving at the airport, Claire sewed the bundles of money into cloth and then into her undergarments. While she does not deny that she intended to conceal the currency from Sudanese authorities, the hiding of the money was also important to reduce the risk of being targeted for robbery. Claire also gave a few packets of money - twenty or thirty thousand dollars - to Mr. Rasheed to hold with him on the way out of Khartoum.

They both boarded the flight for Amsterdam uneventfully. Upon arrival, Claire went to the bathroom, removed the money and placed it in her white

Kenneth Cole hand bag. The packets of money that had been held by Sadig Rasheed were returned to Claire and reunited with the currency in the hand bag.

After an extended layover, Claire and Sadig boarded their flight to New York. Anxious about the fact that she was carrying so much money, she recalls not being able to sleep throughout the journey of almost twenty-four hours.

On approach to JFK Airport, Claire was given a standard Customs declaration form and completed it, accurately indicating that she was carrying more than $10,000 in United States Currency. At the airport, Claire and Sadig were separated due to the fact that Sadig was not yet an American citizen and had been subjected to a lengthy security interview. Claire recalls not only being tired, but also anxious about Sadig as she was referred by the CBP officer for a "secondary inspection."

Carrying her Kenneth Cole bag over her shoulder and pulling her suitcases, Claire maneuvered her way to the desk where the officer was sitting. She was given a FINCEN form, which she attempted to fill out. Among other mistakes she made on the form, Claire wrote $17,000 in the space provided for the amount of currency she was carrying. What followed was a brief, bizarre and confusing exchange between the Border officer and Ms. Abdeldaim after which she realized that she had written $17,000 rather than $170,000. She told the officer it was a

mistake and requested the opportunity to add a zero. As detailed in the PSR at ¶13, even before she reached the interrogation room, barely twenty feet away, she was told that it was "too late."

In the interrogation area, the Border officer introduced her to others as a 'big fish' and, for over an hour, Claire sat in the room as the border officers sat around the table and counted the currency. Not permitted to make or receive phone calls, Claire was able to hear her own phone ringing. She believed, and later learned it to be true, that her daughter Amina was calling incessantly, knowing that her mother should have landed and worried sick that something horrible had happened to her.

<u>Two hours and twenty five minutes</u> after she was detained, two I.C.E. agents entered the room in order to interrogate Claire. Almost two hours of questioning, frustrated, exhausted, scared and, in response to the agents repeated suggestion, Claire said in essence, "I lied on the form to avoid paying taxes." At trial, the agent commented that he was so skeptical of the manner in which she made the admission that he told her, "I don't want you to say that just because I suggested it."

There was also testimony regarding a statement made by Claire during the course of the interrogation to the effect of, "why did I lie." Claire recalls her

statement differently. She recalls, on numerous occasions, asking out loud to herself, "why would I lie?"

Whether it was the former or the latter, the query begs the same question. Given the circumstances, why would she omit a zero on the form. Why would she say that she had $17,000 in cash under her arm - when she really had $170,000.

The government has conceded the obvious point that there was actually no basis for a valid belief that taxes were due on the currency which represented her children's inheritance. So if the deception was not designed to avoid paying taxes, why did she lie? Was it because she believed that she was in violation of the trade embargo? That cannot be, she submitted detailed documents describing the land transaction to the Department of State. So what was it?

While the jury has spoken about Claire's intent, none of the supposed answers to the question make logical sense. From the day we met, Claire has insisted that it was simply a mistake, that she was exhausted, distracted and that when she wrote the numbers, she simply made a mistake. She also recalls that she recognized the mistake and asked for an opportunity to correct it. She asked to simply add a zero. And on this point, there is no disagreement, before she even reached the interrogation room - she was told that it was " too late." (PSR ¶ 7). While the jury apparently was not impressed by this fact, it always seemed very

strange that the special agents who arrived later in the evening were never told until *several months* later that Claire had almost immediately acknowledged her mistake to the Border Officer and requested a chance to correct the form.

Simply put, there was no logical or good reason for Claire to lie about the money. Her physical actions prove that her efforts to conceal the money ended when she left the Sudan. See, PSR ¶7, regarding the underwear, she "stated that she had been wearing the underwear, but took them off and placed them in her purse prior to arriving at JFK International Airport." She placed all of the money in one small bag that she carried over her shoulder to the secondary inspection having just declared on the customs form that she was carrying a large amount of cash. (PSR ¶ 5). In addition, she made sure to bring with her original copies of the legal documents which justified her possession of the money. Is it possible that she panicked at the last minute and wrote $17,000 because she feared that U.S. Customs Officials might behave in a corrupt fashion? Perhaps, but that is not what she recalls nor is it what she has said she believes in her heart.

## IV. <u>OBJECTIONS/COMMENTS TO THE PROBATION REPORT</u>

1. PARAGRAPH 7 - at the end of the paragraph, there is a reference to Claire having been told by her "friends not to declare the money." To the extent that Claire was advised by friends regarding concealing or not declaring money,

those comments relate to her exit from the Sudan. She was never advised not to declare this money upon entry to the United States. (See, PSR ¶ 8) The customs declaration form she completed supports this conclusion.

2. PARAGRAPH 11 - the report suggests in error that the real estate agent in Sudan was paid 15 Sudanese pounds for his services. Ironically, as a result of human error, the probation officer omitted *three* zeros. The correct fee was 15,000 pounds.

3. PARAGRAPH 11 - the report indicates that "obtaining a lawyer and participating in court actions are prohibited under the terms of the United States embargo against the Sudan, a known sponsor of terrorism." The reporting officer offers no reference or basis for this conclusion. As Claire's attorney, I attempted to determine whether her actions would qualify as a violation of the embargo and was unable to reach that conclusion. I would note that if our government's approach to combating terrorism is to use embargos to force its citizens to surrender their valuable assets to the terrorist state, the policy should be reexamined.

4. PARAGRAPH 11 - the reporting officer suggests, again erroneously, that "it was not possible to convert Sudanese money into United States currency...." The embargo did not prevent currency conversion in the Sudan

except to the extent that it encouraged banks and individuals to hoard American dollars. Conversion in the Sudan was legally permitted, there was simply a short supply of dollars.

5. PARAGRAPH 11 - the reporting officer introduces the term "black market" in its description of the mechanism by which Claire converted the proceeds of the sale of the property in the Sudan. The implication is that she availed herself of the assistance of people engaged in illicit businesses. The conversion was accomplished with the assistance of the family of Sadig Rasheed. The "black market" reference is gratuitous and inappropriate and should be redacted.

6. PARAGRAPH 11 - the reporting officer writes in error that Rasheed's family members were paid 2.8% of the $170,000 to convert the money. The reference to 2.8% is related to the Forex currency conversion rate. The actual rate of conversion was 2.68% as is reported in the footnote in the PSR. Mr. Rasheed's family received no compensation for their assistance.

7. PARAGRAPH 12 - as detailed above, the currency was sewed into cloth packets which were concealed in her underwear when Claire left the Sudan. It was not "placed in the handbag" until she had reached the Netherlands.

8. PARAGRAPH 40 - Claire was briefly married to Marck Tortorici - not Torci.

9. PARAGRAPH 41 - the reports erroneously indicates that the defendant's significant other, Sadig Rasheed, is "(age 43)." Mr. Rasheed's was born in 1943. He is approximately 68 years of age.

10. PARAGRAPH 49 - the report erroneously indicates that the removal of an adrenal tumor resulted in high blood pressure. Ms. Abdeldaim's blood pressure normalized after removal of the tumor.

11. PARAGRAPH 59 - notwithstanding the ChoicePoint Clear and Westlaw results, Ms. Abdeldaim has no interest in any on-going business in Pennsylvania. The results are likely related to her efforts to open a home-care facility in Pennsylvania which ended in failure. To Claire's understanding, the facilities are non-operational and the banks have been foreclosed upon the properties.

12. PARAGRAPH 68 - reference is made to the fact that Hayder Abdeldaim was listed as a dependant on Ms. Abdeldaim's tax return far beyond the period that he lived with her. Hayder Abdeldaim is Claire's deceased husband's disabled brother who did live with Claire for a period of time. Attached for the Court's consideration is a letter from Claire's accountant, David Oster, CPA, together with a spread sheet which indicates that the error in reporting

Hayder as a dependent for the time frame in question resulted in an underpayment of $1,391 in federal income taxes. In addition, a $687 underpayment in state income taxes was identified. Ms. Abdeldaim is awaiting advice from her accountant as to whether she is required to file amended returns for each year or whether a lump sum payment can be made.

13. PARAGRAPH S - 71 AND 74 - reference is made to a 2004 Jeep liberty which was purchased by Claire and is located in Haiti. The vehicle remains in Haiti where it is used by Claire when she visits and by relatives when she is in New York. The estimated value of the vehicle is $7,000.00.

14. PARAGRAPH - 73 - attached is a letter from NYS Taxation and Finance dated September 6, 2005 indicating that the tax warrant for $1,740.06 was in "the process of being satisfied." Claire is not aware of why it is that the lien still appears on a judgment search.

## V. GUIDELINE CALCULATION

The defendant does not object to the guideline calculation advanced in the PSR.

## VI. SENTENCING PURSUANT TO 18 USC 3553(A)

It is respectfully submitted that the factors enumerated in **18 USC 3553(a)** support a sentence below the estimated guideline range.

### (1) Nature and Circumstances of the Offense and History and Characteristics of the Defendant

The nature and circumstances of the offense are largely set forth above in this memorandum and were otherwise revealed through the trial testimony. There are, however, a few additional details that are appropriate to mention here.

First and foremost, in traveling to Africa to consummate the sale of the land on behalf of her children, Claire was engaged in an altruistic, dangerous and noble endeavor. Her planning and her actions were those of a person who was attempting to accomplish a difficult task for her children in a foreign country, hostile to women and where she did not speak the language. While she exhibited bravery and an adventurous spirit, there was nothing about this undertaking that evinced an intent to violate the laws of our country. In fact, *everything* that she did prior to the fateful moment when she wrote one too few zeros on the FINCEN form belied the notion that she intended commit a false statement offense at the U.S. border. The nature and the circumstances of the offense, in the absence of a mistake, fall somewhere between bizarre and inexplicable. As suggested by Probation at ¶90, Claire's involvement in this offense are at a bare minimum - "aberrant."

As for the "history and character" of the defendant, at 64 years of age,

Claire has been a model parent, a well-educated and competent care-taker of the down trodden, a loyal friend and generally a person who is beloved by the people who have been graced to be a part of her life.

### 3553 (2)(A) The Need for the Sentence Imposed To Reflect the Seriousness of the Offense

Claire Abdeldaim has already suffered immeasurably from her arrest and conviction. The extreme distress occasioned by her arrest was only aggravated by the fact that the charges resulted in a trial. The calling of her employer as a witness against her was not only humiliating, it had the natural and anticipated effect of putting her employment at risk. While she has been advised that she will be permitted to stay at her job, the conviction will likely result in the revocation of her New York State Social Worker's license and inevitably, termination of her employment.

## VII. TESTIMONIALS

I have taken the liberty of enclosing letters from Claire's children and from Amina's future father-in law. They speak of an intelligent, warm and proud woman who has been deeply affected by what has occurred. Amina describes her mother as her "best friend" and a person who "carries herself with pride, humility and dignity." She offers her "personal assessment" that her mother was simply

"short-sighted or overwhelmed" as insight into the offense conduct.

Her son Mahir, writes that he gives his "mother credit for making important decisions on [his] behalf which formed the foundation of [his] personal development." He also credits his mother with teaching him "respect for the law." Finally, Mahir observes "public, professional and family scrutiny [ ] have severely weighed on [his] mother.

Daughter Fatima describes her mother as "one of the most unique and deeply passionate women I have ever known." She goes on to talk about her mother's shame and embarrassment and comments that her "sole motivation in all that she does or has done is always her children."

Finally, W. Joseph Weiner, Esq. writes that he has known Claire for fourteen years. He knows her to be a "gracious, giving, generous, professional and compassionate person." She has always sacrificed for her children and [ ] wants what is best for them." Joseph Weiner closes by offering his "unconditional love and support" for Claire in his respectful request for leniency from the Court.

I request that Your Honor give these heartfelt statements of support the weight they deserve in the formulation of a fair sentence.

# CONCLUSION

For the foregoing reasons, on behalf of Claire Abdeldiam and her family, I respectfully request that this Court impose a sentence that does not include a period of incarceration.

Respectfully submitted,

JOHN F. CARMAN, ESQ.
(JC-7149)
Attorney for Claire Abdeldaim
666 Old Country Road, Ste. 501
Garden City, NY 11530
(516)-683-3600

cc: Una Dean, Assistant United States Attorney (VIA ECF)
    Michelle Espinoza, United States Probation Officer (VIA ECF)